## E. WILLIAM HALL, JR. *v.* SANDRA BAUGHMAN

[No. 603, September Term, 1976.]

*Decided March 14, 1977.*

The cause was argued before GILBERT, C. J., and MENCHINE and LOWE, JJ.

*Joel Marc Abramson,* with whom were *Talkin & Abramson* on the brief, for appellant.

*Kenneth D. Short*, with whom were *Bounds & Short* on the brief, for appellee.

MENCHINE, J., delivered the opinion of the Court.

E. William Hall, Jr. (husband) filed an amended bill of complaint in the Circuit Court for Howard County against his former wife, Sandra Hall, now remarried and known as Sandra Baughman (but to be described herein as "wife").

The amended bill in substance alleged that husband had executed a deed whereby the title to 9522 Good Lion Road, in Howard County, Maryland, had been granted and conveyed to the wife; that execution of the deed had been made upon condition that an acceptable separation agreement between husband and wife could be reached; and that delivery of the deed to the wife was not intended to occur until such condition had been met.

The wife's answer denied that execution of the deed was conditional or that delivery of the same was not intended.

On May 21, 1976, testimony by husband and witnesses in his behalf was taken in open court with certain documentary evidence filed as exhibits. After husband rested, counsel for wife moved for dismissal of the bill of complaint pursuant to Maryland Rule 535. The motion was granted by the chancellor.

In the face of such a motion, husband "was entitled to have the chancellor consider the evidence and all logical and reasonable inferences deducible therefrom in a light most favorable to him." *Price v. Levin*, 248 Md. 158, 160, 235 A. 2d 547, 548 (1967).

We shall examine the record in the light of that entitlement. Appellant produced uncontroverted evidence that on November 22, 1974, he met his wife at the offices of her attorney. Certain documents were prepared at that time. In the course of discussions husband telephoned his attorney, telling her that he was about to execute a separation agreement and a deed concerning jointly held real property. His lawyer advised that he bring her the

documents for her review. Appellant thus detailed his actions upon receiving that advice:

"Q   And what did you tell [counsel for wife]?

A   That after discussion with Miss Brooks that I felt that it would be very important, that she had insisted that I bring back the documents for her review before we let the agreement and the deed be entered, because she felt that I might not be aware of many of those things. Things that might be important for my protection.

Q   And were you ever given a package of documents?

A   Yes, I was.

Q   Who gave you those package of documents?

A   The then Mrs. Hall.

Q   And what did she — did she say anything to you when she gave you the package?

A   No. It was my understanding I had all the documents."

He explained that he had signed the deed "because there was a notary there it seemed convenient to sign it there, and I simply was going to take it back and have it reviewed. Sort of like signing a check that you aren't going to give to somebody and, having the documents reviewed."

Other testimony by appellant to similar effect included the following:

"Q   Now you say you had the idea that you, that you could always tear up this deed if you didn't — like a check you had written out and hadn't passed it, if you didn't like it later? Is that what you thought?

A   Yes, Your Honor, because I thought I had all the copies of the deed with me when I went over to Rockville to Miss Brooks's office.

Q   You thought you could tear up a deed you had executed to somebody else, without their consent?

A   Yes, I did."

Appellant called as a witness the attorney who represented him at the time. She said that husband had brought to her office the documents she believed to have been signed by her client and then said:

"A   I redrafted the agreement containing most of the major things that they had in mind when they had evidently talked about it and rewrote the waiver of alimony paragraph in particular.

Q   And did you send that agreement to Mr. Vaughan?

A   Yes, I did. *That's the agreement I sent him on November 26th, that was totally rewritten and retyped.*

Q   And Exhibit Number Eight which I am now showing you was the letter which you sent to Mr. Vaughan [wife's counsel] and the agreement which you then revised.

A   Yes.

Q   Now, within that agreement did you deal with the transfer of the house?

A   Yes, I did.

\* \* \*

A   I never had any idea that the house had been transferred between the parties. Throughout the entire case, I always was under the impression that they both jointly owned the real estate property.

Q   In your negotiations with your client, and Mr. Vaughan, was the house a very important factor?

A   It was a major factor, it was the only thing they had that was of any value, everything else was debt.

\* \* \*

Q   *After November 22, 1974 were you still negotiating regarding the transfer of the house as a part of the separation of the parties?*
A   Yes, I was." (Emphasis added.)

Appellant also testified that about October 1, 1975, he learned for the first time that the executed deed had not been included among the papers brought from Vaughan's office and delivered to appellant's counsel. He brought the subject action on October 27, 1975.

Appellant testified that many discussions concerning title to the house were had after the date of the execution of the deed. He said that in March, 1975, he met with Mrs. Hall and Roland Baughman (her present husband) where "we talked about an agreement to transfer the house at that time." He pointed out also that in documents submitted to the Circuit Court in alimony hearings in 1975 he had submitted financial statements listing as an asset his one-half interest in the Good Lion Road home.

The deed, although executed on November 22, 1974, was not recorded until January 13, 1975.

On this testimony (the truth of which for present purposes we are required to assume), we find *Chillemi v. Chillemi,* 197 Md. 257, 78 A. 2d 750 (1951), dispositive of the appeal. In *Chillemi,* Judge Delaplaine, speaking for the Court of Appeals, said at 263-65 [753-54]:

"It has long been held at common law that there cannot be a valid delivery of a deed to the grantee named therein upon a condition not expressed in the deed. The ancient rule that the mere transfer of a deed from the grantor to the grantee overrides the grantor's explicit declaration of intention that the deed shall not become operative immediately is a relic of the primitive formalism which attached

some peculiar efficacy to the physical transfer of the deed as a symbolical transfer of the land. 9 Wigmore on Evidence, 3d Ed., secs. 2405, 2408; 4 Tiffany, Real Property, 3d Ed., sec. 1049. In England in ancient times there could be no change of possession of land until a livery of seisin had taken place. A knife was produced and a piece of turf was cut, the turf was handed over to the new owner. Later, under the Roman influence, the written document came into use. These documents, which few people had the art to manufacture, were regarded with mystical awe. Just as the sod had been taken up from the ground to be delivered, so the document was laid upon the ground and then solemnly lifted and delivered as a symbol of ownership. In this way the principle developed that the delivery of the deed was the mark of finality.

"Through the centuries the courts have struggled to break away from this strict formalism. The first sign of flexibility in the rule was the concession that the delivery of a deed may be conditioned upon the performance of some act or the occurrence of some event, provided that such conditional delivery, known as delivery in escrow, is accomplished by having the deed placed in the hands of a third person for subsequent handing to the grantee. But the concession of conditional delivery was not allowed where the deed was placed directly in the hands of the grantee in anticipation of some future event. Thus this Court, recognizing the rule that a deed cannot be delivered in escrow to the grantee, said in *Buchwald v. Buchwald,* 175 Md. 115, 120, 199 A. 800, that if a deed absolute on its face is deposited by the grantor with the grantee, to be held by the grantee in escrow, such a deposit becomes a delivery which operates to vest the title in the grantee immediately.

"But there is actually no logical reason why a deed should not be held in escrow by the grantee as

well as by any other person. The ancient rule is not adapted to present-day conditions and is entirely unnecessary for the protection of the rights of litigants. After all, conditional delivery is purely a question of intention, and it is immaterial whether the instrument, pending satisfaction of the condition, is in the hands of the grantor, the grantee, or a third person. After the condition is satisfied, there is an operative conveyance which is considered as having been delivered at the time of the conditional delivery, for the reason that it was then that it was actually delivered, although the ownership does not pass until the satisfaction of the condition. We, therefore, hold that it is the intention of the grantor of a deed that determines whether the delivery of the deed is absolute or conditional, although the delivery is made by the grantor directly to the grantee.

\* \* \*

"As we have indicated, the title to property described in a deed delivered conditionally does not pass as long as the condition attached to the delivery of a deed is not satisfied. Therefore, when it becomes assured that the condition will not be satisfied, the deed loses all possible efficacy. In such a case the grantor will ordinarily desire to have the deed returned to him, in order to preclude the possibility of its being used afterwards to his detriment. 4 Tiffany, Real Property, 3d Ed., sec. 1053. In view of the presumption of delivery which naturally arises from the grantee's possession of the deed, the burden rests upon the grantor, when he has delivered the deed to the grantee, to show (1) that the delivery was conditional, and (2) that the condition was not satisfied."

In the subject case the testimony of appellant went beyond the showing in *Chillemi, supra.* Appellant's

testimony was that (1) *execution* of the deed was conditional; (2) *delivery* of the deed was not intended; and (3) the condition was not satisfied. In such circumstances, the chancellor should have required the defendant to respond to the complainant's proof and, if that proof was controverted, to resolve the conflicting evidence.

*Order of dismissal reversed.*
*Costs to be paid by appellee.*